FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUL 19 2017 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
BENJAMIN CRUTCH,

                      Plaintiff,          **MEMORANDUM AND ORDER**

      - against -                         14-cv-3201 (SLT)

CAROLYN W. COLVIN, Acting Commissioner
of Social Security,

                      Defendant.
-------------------------------------------------------------X

**TOWNES, United States District Judge,**

      Plaintiff Benjamin Crutch ("Plaintiff" or "Crutch") commenced this action against the Commissioner of Social Security ("Commissioner") pursuant to 42 U.S.C. §405(g), seeking judicial review of the Commissioner's final decision denying disability insurance benefits under Title II of the Social Security Act. Currently before the Court are the parties' cross-motions for judgment on the pleadings. (Docs. 13 and 15.) The Commissioner requests that her final decision upholding the determination of Administrative Law Judge ("ALJ") David Z. Nisnewitz be affirmed. Plaintiff challenges the ALJ's decision on various grounds. For the reasons explained below, the Commissioner's motion for judgment on the pleadings is **DENIED**, Plaintiff's cross-motion for judgment on the pleadings is **GRANTED to the extent it seeks remand**, and the Commissioner's decision is vacated and the case is **REMANDED** for further administrative proceedings under sentence four of 42 U.S.C. § 405(g). The Clerk of Court is respectfully directed to close the case.

I. **BACKGROUND**

A. **Procedural History**

Plaintiff filed for disability insurance benefits on July 16, 2012, alleging a disability onset date of June 12, 2012. (Tr. 203, 222.)[1] His claim was initially denied on September 17, 2012, (Tr. 154-159), and he then requested a hearing before an ALJ, which was held on September 25, 2013. (Tr. 166-167, 65-141.) On December 9, 2013, ALJ Nisnewitz issued a written decision finding Plaintiff not disabled under the Social Security Act. (Tr. 27-42.) The ALJ's findings became the Commissioner's final decision with respect to Plaintiff's claim when the Appeals Council declined review on April 15, 2014. (Tr. 1-6.) Plaintiff filed the instant action on May 22, 2014, seeking judicial review of the Commissioner's final decision.

B. **Plaintiff's Evidence**

At the hearing before the ALJ, Plaintiff testified that he was born in 1964 and, after graduating high school, joined the United States Air Force. (Tr. 76.) He currently lives with his girlfriend and toddler-aged son; he has been separated from his wife, with whom he has five older children, for eight years. (Tr. 68-69.) Most recently, he worked as a courier for Federal Express for approximately four years before joining the Department of Sanitation, where he worked as a driver/collector for thirteen years. (Tr. 77.)

On May 10, 2010, while riding in the passenger seat of a sanitation vehicle on the way to his route, Crutch sustained injuries to his neck, back, and hip when the vehicle was struck on the passenger side by an unmarked police truck. (Tr. 78-81.) He was treated in the emergency room and released the same day with pain medication. (Tr. 81.) He then followed up with his

---

[1] Citations to "Tr." refer to the certified Administrative Transcript of the record of Plaintiff's proceedings before the Social Security Administration relating to his disability claim. (Doc. 17.)

generalist a few days later, who referred him to an orthopedist and to a pain management center, where he received two steroid injections. (Tr. 83, 88.) Plaintiff returned at an unspecified point after the accident to work on light-duty status, and he continued to be on light-duty status until June 12, 2012, the alleged onset date of his disability. (Tr. 86.)

When the pain from the accident did not subside, Plaintiff sought further treatment and eventually underwent back surgery. (Tr. 88-90.) Following surgery, the pain temporarily grew "tolerable" until, sometime later, Plaintiff slipped and fell in the shower. (Tr. 90.) Plaintiff's pain was worse after the fall, but gradually improved. (Tr. 96.) Plaintiff nevertheless experiences pain every day, approximately a six or seven on a scale of one to ten. (Tr. 96, 112.) He has been weening himself off prescription pain medication but still takes ibuprofen and Advil PM three or four times a week. (Tr. 97-98.) If he does not take the Advil PM, he has a sleepless night. (Tr. 115.) He also sometimes needs to take Tramadol, although he takes nothing approximately two to three days per week because he is concerned about taking too much medication. (*Id.*)

Plaintiff also testified that his pain interferes with his ability to work, stating that he cannot sit or stand for too long without experiencing pain. (Tr. 98-99.) He can sit for about fifteen to twenty minutes at a time before needing to get up and move around, for a total of about four or five hours in an eight hour work day. (Tr. 108-109.) He usually lays down the rest of the day. (Tr. 111.) He can lift twenty pounds but experiences pain when doing so. (Tr. 109.) At home, he can cook quick meals and do a little sweeping, but does not do laundry, mop, dust, or take out the garbage. (Tr. 110-111.)

Crutch can drive locally, but does not drive himself long distances because it is "irritating." (Tr. 105.) However, he has travelled since his accident in May 2010. He flew to

the Dominican Republic in the fall of 2010 for a vacation. (Tr. 102.) He also took a car trip to North Carolina in 2011 for a funeral, and visited friends in the Poconos and in New Jersey. (Tr. 103-105.) He spends time with this three-year-old son, watches him play in the yard, and walks him to a nearby park. (Tr. 106.) Crutch can walk about three or four blocks before feeling pain and needing to rest, and can walk about seven blocks total. (Tr. 106-107.)

To treat his pain, Crutch does exercises at home, including leg lifts for ten minutes a day, three times a week. (Tr. 112.) Twice a week, for about 15 minutes, he rides a stationary bike. (Tr. 112-113.) Crutch also does pushups, and can do about ten total if he rests after five. (Tr. 114.)

### C. Medical Evidence

1. Ramkumar Panhani, M.D., Internist

On May 3, 2010, just two days after his accident, Plaintiff was evaluated by Dr. Ramkumar Panhani. Dr. Panhani noted that Crutch was in "mild distress." (Tr. 337.) The physical examination revealed neck pain, tenderness of paraspinal muscles radiating into the right shoulder, tenderness of lumbar spine on palpation, and tenderness of paravertebral muscles. (Tr. 338.) Straight leg raising test was positive at approximately forty degrees, and lumbosacral flexion and extension was reduced, as was squatting. (*Id.*) Plaintiff also exhibited decreased range of motion and tenderness in the right shoulder. (*Id.*) Dr. Panhani recommended he continue NSAID's for pain, obtain chiropractic treatment, and get an MRI if needed. (Tr. 339.)

4

2. Michael Genco, D.C., Chiropractor

Also on May 3, 2010, Plaintiff sought chiropractic treatment from Dr. Michael Genco, D.C. (Tr. 341-342.) Dr. Genco observed reduced cervical and dorso-lumbar ranges of motion and visible and palpable muscle spasms of the cervical, thoracic, periscapular and lumbar paraspinal musculature. (Tr. 341-342.) He also observed marked tenderness in the affected areas, except in cervical musculature. (*Id.*)

3. Jagga Alluri, M.D., Neurologist

On January 6, 2011, Plaintiff consulted Dr. Jagga Alluri, a neurologist and clinical neurophysiologist. (Tr. 373-376.) Dr. Alluri observed weakness (4/5) in the dorsiflexion in the left lower extremity, as well as a weakness (4/5) in the left quadriceps. (Tr. 375.) A straight leg raising test was positive at 30 degrees. (*Id.*) Dr. Alluri noted in a written report that Plaintiff had decreased and painful range of motion on the flexion in the lumbar region. (*Id.*) Importantly, while a nerve conduction study was within normal limits, Dr. Alluri found evidence of left S1 radiculopathy. (Tr. 375, 377-380.) Dr. Alluri prescribed pain medication, and recommended physical therapy and an MRI. (Tr. 375-376.) He also recommended Plaintiff avoid driving and heavy lifting. (*Id.*) An MRI performed one week later revealed straightening of the lumbar lordosis, which Dr. Charles Demarco, M.D., of Middle Village Radiology deemed consistent with muscle strain and posterior disc herniation at L4-L5 and L5-S1. (Tr. 385.)

The following week, on January 21, 2011, Dr. Alluri evaluated Plaintiff again and diagnosed left S1 radiculopathy and posterior herniated disc at L4-L5 and L5-S1. (Tr. 381.) Upon examination, Plaintiff showed mild improvement, but still exhibited weakness in the dorsiflexion of the left lower extremity, and lumbar paraspinal muscles. (*Id.*) Straight leg raising test was positive at 30 degrees. (*Id.*) Nevertheless, his gait was "normal." (*Id.*) In

follow up consultations on February 9, March 14, and April 20, 2011, Dr. Alluri determined that Plaintiff's symptoms remained unchanged. (Tr. 382-384.)

    4. Joshua B. Bederson, M.D., Neurosurgeon

On March 18, 2011, several months after his initial visit to Dr. Alluri, Plaintiff also visited Dr. Joshua B. Bederson, M.D., a neurosurgeon and professor of neurosurgery. (Tr. 371-372.) In a written report, Dr. Bederson opined that Crutch was antalgic, but did not demonstrate any focal deficits and had normal anterior tibialis, extensor halluces, and plantar flexion. (Tr. 371.) However, Dr. Bederson did observe left L5 and partial S1 sensory loss, a "remarkably" positive straight leg raising test, and supressed deep tendon reflexes on the left side. (*Id.*) Dr. Bederson also noted that these observations are confirmed by Plaintiff's January 2011 MRI. (*Id.*) Dr. Bederson further opined that Crutch "has lumbar degenerative changes including herniated disk at L4-L5 and L5-S1. He has evidence of a left L5 and possibly to a lesser extent S1 sensory radiculopathy with no motor changes." (Tr. 372.) Dr. Bederson did not recommend surgery at that time. (*Id.*)

    5. Xinqi Xu, M.D., Family Doctor

Plaintiff also saw his family doctor, Dr. Xinqi Xu, M.D., for back pain treatment. (Tr. 318.) At visits on March 26, June 28, and October 4, 2011, Dr. Xu monitored his pain medication and course of treatment. (Tr. 318, 320-323.) In March, Crutch reported to Dr. Xu that pain in his lower back, radiating down his left leg, was tolerable at a level of six out of ten. (Tr. 318.) The pain remained after his surgery, but no longer tingled or radiated down his leg. (Tr. 320.) The pain became severe again after his fall in October 2011. (Tr. 322.)

6. Sebastian Lattuga, M.D., Treating Orthopedic Surgeon

Plaintiff also treated with Dr. Sebatian Lattuga, M.D., a board certified orthopedic and spine surgeon. (*See* Tr. 386-392, 410-413, 425-459.) Physical evaluation on April 25, 2011 revealed the following:

> <u>Spine Exam</u>:
> o **Thoracolumbar**: Inspection to percussion and palpation shows tenderness and spasms noted. There are restricted ranges of motion, 20 degrees of flexion (90° is normal), 10 degrees of extension (40° is normal), left and right turning to 15 degrees (60° is normal).
> o **The Right and Left Lower Extremities** are **not** within normal limits on inspection, as described below.
> <u>Neurological</u>:
> o Patient has normal coordination and abnormal gait.
> o Motor strength is abnormal: TA and EHL 4+/5 bilaterally.
> o Sensation is decreased in the L4, L5 and S1 nerve root distributions.
> o Examination of the reflexes are symmetric.

(Tr. 386-387) (emphasis in original.) After reviewing the January 14, 2011 MRI, Dr. Lattuga diagnosed lumbar radiculopathy and herniated nucleus pulposus. (Tr. 387.) Dr. Lattuga and Plaintiff discussed treatment options and decided to proceed with physical therapy, lumbar epidural steroid injections, and a Posterior Spinal fusion and Laminectomy at Level L4, L5, and S1. (*Id.*) At a follow-up visit on June 20, 2011, Plaintiff's condition remained unchanged, (Tr. 426-427), but an x-ray of the lumbar spine showed positive right pars fracture at L5, greater than 50% collapse of disc space at L4-5, and 10mm of translation L4 on L5. (Tr. 449.)

The surgery took place two days later on June 22, 2011, at Franklin Hospital Medical Center. (Tr. 288-294.) At a follow-up visit on July 5, 2011, Dr. Lattuga noted Crutch was doing well post-surgery, with less pain, but was still experiencing residual pain consistent with pre-operative conditions. (Tr. 388.) Physical evaluation revealed a restricted range of motion, and no change from pre-operative motor strength, sensation, and reflexes. (*Id.*) Dr. Lattuga continued to monitor Plaintiff's condition, and Plaintiff exhibited improvement from pre-

operative back pain levels on August 22, and September 19, 2011. (Tr. 429-430.) On October 10, 2011, Dr. Lattuga noted that Crutch was doing well "until he fell." (Tr. 430.) Nevertheless, lumbar x-rays were satisfactory with respect to the advancing fusion mass and showed no movement of the surgical hardware resulting from the fall. (Tr. 431.) There was no change in Crutch's condition on November 1, 2011. (Tr. 431-432.) On February 7, 2012, Dr. Lattuga noted that the symptoms caused by Crutch's fall were resolved. (Tr. 432.)

Dr. Lattuga's narrative reports show no material changes in Crutch's spine or neurological exam through a follow-up visit on August 9, 2012. (Tr. 433-434.) At the August visit, Dr. Lattuga continued to instruct Crutch to "refrain from any activity that exacerbates symptoms such as lifting, carrying, bending, [and] twisting." (Tr. 434.) On March 11, 2013, Crutch exhibited a slightly increased range of motion, but Dr. Lattuga's physical restriction recommendation remained the same. (Tr. 435.) In a narrative report dated March 12, 2013, Dr. Lattuga recorded his opinion as follows:

> If the information given to me by the patient is accurate, then the patient's lumbar injury, symptomatology and surgery are directly and causally related to the motor vehicle accident on 05/01/2010. Patient sustained an injury to his back as a result. He will have permanent chronic pain exacerbated by all movement involving the back. His prognosis for a full complete recovery to a pre accident level of pain of the lumbar spine is poor.

(Tr. 436.)

Finally, on September 20, 2013, Dr. Lattuga completed a Treating Doctor's Patient Functional Assessment To Do Sedentary Work (the "Functional Assessment"). (Tr. 457-458.) In the Functional Assessment, Dr. Lattuga indicated that Crutch could: stand and/or walk for a total of less than four hours in an eight-hour work day; sit for a total of less than four hours in an eight-hour work day; and lift and/or carry more than five pounds, but less that ten pounds, for a total of up to 2/3 of an eight-hour work day. (*Id.*) The Functional Assessment also indicated that

8

Plaintiff: requires frequent breaks of fifteen minutes or more; suffers pain which prevents him from performing eight hours of work; requires medications that interfere with his ability to function at work; would have trouble concentrating and be off-task more than 10% of the day, and requires an average of five or more sick days off per month. (Tr. 458.) Dr. Lattuga listed his clinical findings in support of his conclusions, including a positive MRI for lumbar herniated nucleus pulposus, spinal fusion surgery, decreased range of motion, and altered sensation. (*Id.*)

    7. Paul M. Manadan, M.D., Pain Specialist

For pain management, Crutch saw Dr. Paul Manadan, M.D., an anaesthesiologist and Director of Pain Management at Flushing Hospital Medical Center. (Tr. 368.) At an initial examination on February 17, 2011, Plaintiff exhibited a positive straight-leg raise test on the left side and decreased sensation to pinprick in the left S1 dermatome compared to the right side. (Tr. 369.) Dr. Manadan also observed that Plaintiff had positive facet loading on the left side. (*Id.*) Plaintiff was scheduled for two epidural steroid injection procedures, which took place on February 23, and March 7, 2011. (Tr. 279-280, 369.)

    8. Iqbal Teli, M.D., Consulting Physician

On September 6, 2012, Crutch was evaluated by consulting internist Dr. Iqbal Teli, M.D. (Tr. 329-332.) Dr. Teli noted Crutch's pain was a seven out of ten, radiating down the left lower extremity, but without numbness. (Tr. 329.) Crutch took Tramadol to treat the pain, which occurs in the mornings and lasts for half an hour. (*Id.*) Around the house, Crutch cooks once a week, showers and dresses himself daily, but does no cleaning. (*Id.*) Upon physical examination, Crutch had a normal gait and stance, could walk on his heels and toes without difficulty, and needed no help changing or getting on and off the exam table. (Tr. 330.)

However, Crutch could only squat 80% due to pack pain. (*Id.*) Dr. Teli's musculoskeletal examination was mostly normal, but exhibited a restricted range of movement, as follows:

> MUSCULOSKELETAL: Cervical spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. No scoliosis, kyphosis, or abnormality in thoracic spine. Lumbar spine shows full flexion, extension 25 degrees, lateral flexion 20 degrees bilaterally, and rotary movement 20 degrees bilaterally. . . .

(*Id.*) Dr. Teli's neurologic examination revealed diminished left hand and left leg pain sensation. (Tr. 331.) As a result of the examination, Dr. Teli concluded that Crutch "has a mild restriction for squatting and mild restriction for lifting and carrying heavy weights." (*Id.*)

       9.   Chaim B. Eliav, M.D., Testifying Medical Expert

Dr. Chaim B. Eliav, M.D., a physiologist, testified as an impartial medical expert at the hearing. In Dr. Eliav's opinion, after reviewing the medical evidence in the record, "while there isn't a listing [impairment] equaled or met there are deficits in activity." (Tr. 120.) Specifically, Dr. Eliav concluded Crutch should only do occasional bending or squatting, and no crawling. (Tr. 121.) He also concluded that Plaintiff's heavy lifting should be limited to no more than ten pounds frequently and twenty pounds occasionally. (Tr. 120.) Back extension, or arching, should also be limited. (Tr. 121.) Otherwise, Dr. Eliav determined that Crutch could sit or stand for an entire eight hour work day, so long has he was able to change positions every hour for five minutes to prevent stiffening. (Tr. 122.)

To reach this conclusion, Dr. Eliav relied on Dr. Lattuga's treatment reports, which showed restricted range of movement, but essentially normal lower extremity strength. (Tr. 117.) He also took into account the fact that Crutch had spinal surgery, and exhibited decreased sensation at the L4, L5, and S1 nerve distributions. (Tr. 166-117.) Dr. Eliav did not take into

account the diagnosis of S1 radiculopathy based on the January 6, 2011 nerve conduction studies. In Dr. Eliav's opinion, based on his experience reading and conducting nerve conduction studies in private practice and teaching, the slight increased spontaneous activity in Plaintiff's results was not evidence of S1 radiculopathy. (Tr. 118-119.) Rather, the increased activity was a result of scar tissue from Plaintiff's surgery, and was not neurologic in origin.[2] (Tr. 123.) Finally, Dr. Eliav relied on notes from Dr. Teli's examination to conclude that, although Crutch has a somewhat reduced squat, his status is "largely intact." (Tr. 119.)

### D. The ALJ's Decision

ALJ Nisnewitz issued his written decision finding Plaintiff not disabled on December 9, 2013. In the decision, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016, and had not engaged in substantial gainful activity since the alleged onset date of his disability, June 12, 2012. (Tr. 34.) Additionally, the ALJ found Crutch has a history of lumbar disc herniation status-post L4-5 S1 laminectomy and discectomy, which impairs his ability to perform basic work activities. (*Id.*) Thus, Plaintiff was found to have a severe impairment. (*Id.*) Plaintiff's history of hypertension, however, constituted a non-severe impairment. (Tr. 35.) Considering both conditions, the ALJ determined that Crutch did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 35.) Therefore, ALJ Nisnewitz reviewed the record and determined Plaintiff had the Residual Functional Capacity ("RFC") to perform light work, as follows:

> The claimant is able to: lift/carry 10 pounds frequently and 20 pounds occasionally; stand/walk/sit for 8 hours in an 8-hour workday with 5 minute

---

[2] As explained above, Crutch's spinal surgery in fact took place on June 22, 2011, more than five months after the January 6, 2011 nerve conduction study. (Tr. 291-294.)

11

      breaks each hour (at the work station/site); and occasionally bend and squat. The claimant cannot crawl.

(Tr. 35.)

To reach this RFC, the ALJ accorded Dr. Alluri's and Dr. Manadan's opinions some weight. (Tr. 36.) The ALJ also gave some weight to Dr. Lattuga's treatment reports "as he treated the claimant, though [his] opinion is not entirely consistent with the record and does not quantify the specific limitations." (Tr. 37.) With respect to Dr. Lattuga's September 20, 2013 Functional Assessment, however, the ALJ accorded Dr. Lattuga's opinion limited weight "because it was inconsistent with the record, including his own treatment records," and Crutch's own estimations of his limitations, and because it "overly amplified the claimant's limitations." (Tr. 38.) The opinion of Dr. Teli was given significant weight, "as it was consistent with the evidence overall above, and with the physical examination of the claimant." (*Id.*) The opinion of Dr. Eliav, the testifying medical expert, was "given great weight as it was supported by the record as a whole and he was able to cite to the record to support his opinion." (*Id.*) Finally, the ALJ determined that Crutch's medically determined impairments could reasonably be expected to cause his alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (Tr. 39.)

Based on these findings, the ALJ determined that Crutch was unable to perform his past relevant work, but considering his age, education, work experience, and RFC, there were jobs in significant numbers in the national economy that Crutch could perform. (Tr. 41.) Thus, the ALJ found Crutch was not disabled. (*Id.*)

## II. ANALYSIS

### A. Standard of Review

A final determination of the Commissioner of Social Security upon an application for disability benefits is subject to judicial review as provided in 42 U.S.C. § 405(g). *See* 42 U.S.C. § 1383(c)(3). A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited to determining whether the conclusions were supported by substantial evidence in the record and were based on a correct legal standard. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

"Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). "In determining whether substantial evidence supports a finding of the Secretary [now, Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn." *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991). The "substantial evidence" test applies only to the Commissioner's factual determinations. Similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984).

"Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986. However, where application of the correct legal principles to the record could lead only to the same conclusion reached by the Commissioner, there is no need to remand for agency reconsideration. *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

### B. Standard for Determining a Disability

In order to gain federal disability benefits under the Social Security Act, a claimant must establish that she has a "disability." *See Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Under the Act, "disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (2004). To be eligible to receive benefits, "an applicant must be 'insured for disability insurance benefits.'" *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989) (quoting 42 U.S.C. §§ 423(a)(1)(A) & 423(c)(1)). Here, Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2016. (Tr. 34). Thus, Plaintiff must prove that he was disabled within the meaning of the Social Security Act on or before that date.

When evaluating a claim for disability benefits, the ALJ must follow the five-step procedure set forth by the Commissioner's regulations.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the

> claimant has such an impairment, the Commissioner will consider him [per se] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (alterations in original); *see* 20 C.F.R. § 404.1520. The claimant bears the burden of proof for the first four steps of the inquiry, but the Commissioner bears the burden for the fifth step. *Selian*, 708 F.3d 409, 418; *see also Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

### C. The Treating Physician Rule

"The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)); *see also Shaw*, 221 F.3d at 134 ("[T]he medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other ... evidence."); 20 C.F.R. § 404.1527(c)(2). If the ALJ decides against giving the opinion of a treating physician controlling weight, various factors must be applied to decide how much weight the opinion will be given. 20 C.F.R. § 404.1527(c)(2)(i)-(ii), 3-5. The ALJ must consider: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the relevant evidence supporting the opinion, particularly medical signs and laboratory findings; 4) the consistency of the opinion with the record as a whole; and 5) whether the physician is a specialist in the relevant medical area. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008).

Additionally, when the treating physician's opinion is not given controlling weight, the ALJ must give good reasons for the weight that is given. 20 C.F.R. § 404.1527(c)(2). Failure to give such reasons is alone grounds for remand. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)); *Milien v. Astrue*, 10-CV-2447 (JG), 2010 WL 5232978, at *8 (E.D.N.Y. Dec.16, 2010) (citing former 20 C.F.R. § 404.1527(d)(2) and *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004)). While the opinion of a treating physician may be properly denied controlling weight if inconsistent with other evidence, "not all expert opinions rise to [a] level ... that is sufficiently substantial to undermine the opinion of [a] treating physician." *Burgess*, 537 F.3d at 128. For example, vague consultative opinions describing a claimant's limitation in terms such as "mild" or "moderate" are insufficient to undermine the opinion of a treating physician. *Martinez v. Colvin*, No. 13-CV-0834 (FB), 2014 WL 2042284, at *3 (E.D.N.Y. May 19, 2014) (citing *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000)); *see also Selian*, 708 F.3d 409, at 421.

### D. Discussion

Plaintiff argues the ALJ improperly applied the treating physician rule by failing to accord controlling weight to Dr. Lattuga's opinions. As set forth above, the ALJ was required to give controlling weight to Dr. Lattuga's opinions, or else give good reasons for the weight that is given. *See* 20 C.F.R. § 404.1527(c)(2). The ALJ, however, did not meet this obligation.

In his written decision, the ALJ accorded some weight to Dr. Lattuga's opinion that Crutch should "refrain from any activity that exacerbates symptoms such as lifting, carrying, bending, [and] twisting." (Tr. 37, 434.) The "good reasons" cited for discounting this opinion were that it "is not entirely consistent with the record and does not quantify the specific limitations." (Tr. 37.) This conclusory, one-sentence explanation does not fulfill the ALJ's

obligation under the treating physician rule. *See Morgan v. Colvin*, 592 F. App'x 49, 50 (2d Cir. 2015) (Summary Order); *Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010) (Summary Order). Without specific citations to the medical record identifying specific portions that are inconsistent, the Court cannot properly review the ALJ's decision, and claimants are deprived of an adequate understanding of the reasoning behind the disposition of their cases. *Marchetti v. Colvin*, No. 13-CV-02581 (KAM), 2014 WL 7359158, at *13 (E.D.N.Y. Dec. 24, 2014) (remanding for ALJ's failure to specify what portions of the record were inconsistent with treating physician's opinion); *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (remanding for the Commissioner to provide an explanation of why the treating physicians' opinions were not credited.)

Indeed, the only evidence in the record that is obviously inconsistent with Dr. Lattuga's opinion consists of Dr. Teli's assessment, which was accorded "significant weight," and Dr. Eliav's opinion, which was accorded "great weight." While a consulting physician or expert opinion may in some cases override those of a treating physician, this is not one of those cases. Dr. Teli, an internist, is not a specialist in the field of Plaintiff's injuries and examined Crutch only once. *See Selian*, 708 F.3d at 419 ("ALJs should not rely heavily on the findings of consultative physicians after a single examination."). Moreover, his opinion of Plaintiff's physical limitations lacked any specificity, and consisted of only the single sentence that "[t]he claimant has a mild restriction for squatting and mild restriction for lifting and carrying heavy weights." (Tr. 331.) Dr. Teli's opinion is simply too vague and unsubstantial to be relied upon. *See Burgess*, 537 F.3d at 128 (expert opinions that are vague, "not substantial," or that address only issues of which claimant was not complaining, cannot undermine treating physician opinion.); *Martinez v. Colvin*, No. 13-CV-0834 (FB), 2014 WL 2042284, at *3 (E.D.N.Y. May

19, 2014) (citing *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000)) (ALJ erred in relying on consultative physician's vague report). The significant weight accorded to Dr. Teli's wholly unspecific opinion is especially puzzling given the fact that Dr. Lattuga's opinion was discounted for its failure to "quantify [Plaintiff's] specific limitations." (Tr. 37.)

      Nor is Dr. Eliav's opinion of Crutch's limitations more reliable. Dr. Eliav did not personally examine Plaintiff; his opinion is based purely on a review of Plaintiff's medical records. It is clear from the hearing testimony, moreover, that Dr. Eliav's review was deficient in at least one major respect. Dr. Eliav relied on his extensive experience interpreting electrodiagnostic tests to dispute the diagnosis of radiculopathy. Dr. Eliav interpreted the slight increased spontaneous activity in Crutch's January 6, 2011 results as mere scar tissue from his surgery, rather than as evidence of radiculopathy. (Tr. 118-119, 123.) However, the record clearly shows that Crutch underwent surgery over five months later, on June 22, 2011. (Tr. 291-294.) Every other doctor to consider the results diagnosed radiculopathy, including Drs. Alluri, Bederson, and Lattuga. (Tr. 381, 372, 387.) Dr. Eliav's opinion of Plaintiff's physical limitations, which greatly resembles the ALJ's RFC, is therefore based on a clear misreading of the record, and cannot properly serve as a comparator to Dr. Lattuga's opinion. Without any further detail specifying how Dr. Lattuga's opinion is inconsistent with the record, this reason for discounting Dr. Lattuga's opinion is simply insufficient to fulfill the ALJ's obligation under the treating physician rule. *See Morgan v. Colvin*, 592 F. App'x at 50.

      The second reason given for discounting Dr. Lattuga's opinion, that it failed to quantify Plaintiff's specific physical limitations, is also not a good reason. Dr. Lattuga did submit the Functional Assessment upon request, and that assessment in fact quantified Crutch's limitations. The ALJ, however, accorded the Functional Assessment only limited weight "because it was

inconsistent with the record, including his own treatment records," and Plaintiff's own estimations of his limitations, and hence "overly amplified the claimant's limitations." (Tr. 38.) Again, the ALJ's reasons are conclusory; there is no explanation of what specifically in the Dr. Lattuga's treatment notes or Plaintiff's testimony contradicts the Functional Assessment.

The Commissioner argues in detail that Dr. Lattuga's Functional Assessment is inconsistent both with the record and with Plaintiff's self-reported activity. (Mem. of Law in Sup. of the Def.'s Mot. For Judgment on the Pleadings, Doc. 14, 19-21.) However, none of these alleged inconsistencies were cited by the ALJ as reasons for discounting Dr. Lattuga's Functional Assessment, and the Court is not permitted to accept *post hoc* rationalizations for agency action. *Newbury v. Astrue*, 321 F. App'x 16, 18 (2d Cir. 2009) (Summary Order) (quoting *Snell*, 177 F.3d at 134). It is the ALJ's obligation to "comprehensively set forth [the] reasons for the weight assigned to a treating physician's opinion." *Halloran*, 362 F.3d at 33.

In short, the ALJ's reasons for failing to accord Dr. Lattuga's opinions of Crutch's physical limitations controlling weight were conclusory, were otherwise inadequate, and did not constitute "good reasons" for the purpose of the treating physician rule. *See Rugless v. Comm'r of Soc. Sec.*, 548 F. App'x 698, 699-700 (2d Cir. 2013) (Summary Order) (remanding because ALJ's conclusory explanation for discounting treating physician's opinion did not fulfill obligation to provide "good reasons"). While the medical record may provide good reasons for disfavoring Dr. Lattuga's opinion, under the treating physician rule the ALJ must explain these reasons in the first instance. On remand, the ALJ must state his findings and provide good reasons for the weight he accords to Dr. Lattuga's opinion with reference to specific evidencein the record.

### III. CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings (Doc. 13) is **DENIED**, Plaintiff's cross-motion for judgment on the pleadings (15) is **GRANTED to the extent it seeks remand**, and the Commissioner's decision is vacated and the case is **REMANDED** for further administrative proceedings under sentence four of 42 U.S.C. § 405(g). The Clerk of Court is respectfully directed to close the case.

**SO ORDERED**

/s/ *Sandra L. Townes*
SANDRA L. TOWNES
United States District Judge

Dated: July 18, 2017
Brooklyn, New York